THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAYVED WOODARD, | ) Docket No. 04-141E |
| | ) (Judge Sean J. McLaughlin) |
| Plaintiff | ) |
| | ) ELECTRONICALLY FILED PLEADING |
| v. | ) |
| | ) JURY TRIAL DEMANDED |
| PHB DIE CASTING | ) |
| | ) DEFENDANT'S REPLY BRIEF IN SUPPORT |
| Defendant | ) OF MOTION FOR SUMMARY JUDGMENT |
| | ) |
| | ) Filed on behalf of:  PHB Die Casting |
| | ) |
| | ) Counsel of record for this party: |
| | ) Richard A. Lanzillo, Esq. |
| | ) Knox McLaughlin Gornall |
| | ) & Sennett, P.C. |
| | ) 120 West 10th Street |
| | ) Erie, PA 16501 |
| | ) Telephone (814) 459-2800 |
| | ) Facsimile (814) 453-4530 |
| | ) Email rlanzillo@kmgslaw.com |
| | ) PA53811 |

**REPLY BRIEF OF DEFENDANT PHB DIE CASTING IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**I.   INTRODUCTION**

In support of its Motion for Summary Judgment, defendant, PHB Die Casting ("PHB"), thoroughly reviewed the record, including the testimony of the plaintiff, Dayved Woodard, to demonstrate the legal insufficiency of Woodard's hostile environment claim, disparate impact claim and constructive discharge claim.  In his response to PHB's motion, Woodard has presented a literal tour de force of multi-layered hearsay, admitted "rumor," and bald-faced misrepresentations of the record.  This "evidence" is insufficient to overcome PHB's Motion for Summary Judgment.  Moreover, when scrutinized, the assertions of Woodard's brief further demonstrate the lack of substance and merit of his claims.

## II. DISCUSSION

### A. The Jackson settlement has no evidentiary value in this case.

In his brief, Woodard asserts that "[t]he record reflects that there is a long line of African Americans that (sic) were subjected to discriminatory conduct of PHB employees and management beginning with a charge filed by Frederick Jackson who had alleged that he was disciplined more severely for similar offenses than white individuals." (Plaintiff's Brief in Opposition to MSJ, p.3). Woodard goes on to note that Jackson's lawsuit was eventually settled for the sum of $10,000.00. (Id.) Woodard offers no testimony, affidavit or other evidence from the Jackson case or any other evidence to support that Frederick Jackson was ever subjected to any form of discrimination. Instead, he relies upon the mere fact that Jackson made a claim of discrimination and that the claim was ultimately settled. This is evidence of nothing.

Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits in opposition to a motion for summary judgment "be made on personal knowledge, <u>set forth such facts as would be admissible in evidence</u>, and show affirmatively that the affiant is competent to testify to the matters stated therein." Rule 408 of the Federal Rules of Evidence specifically provides that evidence of settlements and offers of settlement are inadmissible, except under extremely limited circumstances that are not relevant to this case. Rule 408 states in pertinent part:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.

F.R.E. 408.

Moreover, the Jackson case is irrelevant temporally and in subject matter. PHB discharged Jackson from his employment at PHB on March 19, 1999, long before any events relevant to this case. The complaint in the Jackson case did not even allege that Jackson was subjected to a racially hostile work environment. (See Complaint, EEOC vs PHB, Inc. d/b/a PHB Die Casting, Exhibit C to Plaintiff's Brief in Opposition to MSJ). According to the Complaint, Jackson was fired for making threats against a supervisor. The Complaint alleged that similarly situated white employees were not terminated under similar circumstances. PHB disputed this claim, and the parties' settlement agreement expressly acknolwledged that PHB was making no admission of liability. (See Exhibit D to Plaintiff's Brief in Opposition to MSJ). Woodard has offered no affidavit, deposition testimony or other *evidence* to support a finding that PHB's termination of Jackson was for anything other than legitimate, non–discriminatory reasons.

Thus, the "evidence" offered by Woodard concerning the Jackson case and settlement is both impertinent and inadmissible.

    **B.**    **The deposition testimony of George Arrington does not support Woodard's claim.**

According to Woodard's brief "[f]ormer PHB employee George Arrington… testified to witnessing and receiving discriminatory treatment," including witnessing "racial graffiti in the bathroom." (Plaintiff's Brief in Opposition to MSJ, p.3, *citing* Arrington Depo., 8). George Arrington started working for PHB in 1988. His last active day of employment at PHB was June 8, 2001 (Arrington Depo., 7). Arrington had no contact with PHB's facility after June 8, 2001. Woodard did not walk off the job at PHB until October 17, 2003, more than two years and four months later. While Arrington testified that he had seen racial graffiti at PHB "over the years," he could not recall when he saw such graffiti. (Arrington Depo., 9). In fact, he

could not even recall the year he saw any such graffiti. (Id.). He similarly could not recall the frequency he observed any such graffiti other than he believed it was "more than once." (Arrington Depo., 10). He acknowledged that he never reported the presence of any graffiti to management. (Id.). Although Arrington could not recall when he observed any racial graffiti at PHB, he did remember that it was located inside a bathroom stall and surrounded by other graffiti of a non-racial nature, such as graffiti directed at supervisors. (Arrington Depo., 12-13). Arrington acknowledged that, when notified of the presence of graffiti, PHB personnel would paint over it or otherwise remove it. (Arrington Depo., 12-13).

Arrington's testimony makes it clear that he has no knowledge concerning any alleged racial graffiti in PHB's workplace for the last two years and four months of Woodard's employment. Jamal Shields, an African American who has worked as a die cast production operator (DCPO) since 1996, testified that he never observed a single instance of racial graffiti at PHB during his nine years of employment. (Shields Depo., 4-5). Cari Goodwine, who worked as a DCPO at PHB from March of 2000 to July of 2004, similarly testified that he never observed any racial graffiti in the workplace. (Goodwine Depo. (1/29/05), 83; (2/12/05), 68).

Arrington's testimony does not contradict the testimony of Shields or Goodwine. Because Arrington cannot even specify a year when he allegedly observed racial graffiti, a jury could do nothing more than speculate as to when Arrington allegedly observed such graffiti during his 13 years of employment with PHB. Moreover, Arrington acknowledged that any graffiti he observed was promptly painted-over or otherwise removed by PHB. Thus, the record in this case can support only two possible inferences: Either racial graffiti did not exist in the workplace during the relevant time period or any such graffiti was truly de minimis and promptly removed. The record in no way supports that racial graffiti contributed to a workplace

"permeated with 'discriminatory intimidation, ridicule, and insult' that [was] sufficiently severe or pervasive to alter the conditions of [Woodard's] employment and create an abusive working environment."  Nat'l R.R. Passenger Corp v. Morgan, 536 U.S. 101, 115-116 (2002) (*quoting* Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

According to Woodard's brief, Arrington "[h]eard rumors as to other PHB employees attending KKK rallies." (Woodard Brief pp. 3-4, *citing* Arrington Depo., 14).  This testimony comes out of left field.  It is yet another transparent attempt by Woodard to throw evidentiary garbage at the wall to see what might stick.  Woodard does not attempt to explain what relevance supposed "rumors" about the KKK, which no other employee, including Woodard, ever heard, may have in the context of this case.  There is not one shred of evidence that any employee of PHB has ever been involved with the KKK.  In fact, Arrington testified that the alleged "rumors" were actually part of "joking" banter between Arrington and other employees that Arrington did not find to be offensive.  (Arrington Depo., pp. 42-44).

On one occasion, Arrington recalled that, in a moment of anger, another employee used the word "nigger" in his presence.  However, he could not recall the year when this occurred and he noted that the employee promptly apologized for the remark.  (Arrington Depo., p. 18).  Arrington testified that no one at PHB ever made a comment in his presence that he considered worthy of reporting to the human resources department or that created any ill will that he was unable to resolve with his fellow employee.  (Arrington Depo., 46-47).

While Arrington's testimony is consistently vague, frequently internally inconsistent, and sometimes incomprehensible, he was clear that the few isolated comments that he vaguely recalled had nothing whatsoever to do with Dayved Woodard.

### C. Woodard's brief blatantly misrepresents the record regarding Gary Gebhardt.

Woodard's brief blatantly misrepresents the record relative to former employee Gary Gebhardt.

First, Woodard states that "Foreman Gary Gebhardt has stated that he doen't watch football anymore because of there being to (sic) many niggers playing." (Plaintiff's Brief in Opposition to MSJ, 4). In support of this representation, Woodard cites page 17 of the deposition of Jamal Shields. In fact, on that very page and again on the following page of his deposition, Mr. Shields confirms that he has ***never*** heard any PHB supervisor use the word "nigger" at any time during his more than nine years of employment at PHB. (Shields Depo., 17-18). Instead, Mr. Shields testified that another employee had told him that Gebhardt allegedly made such a comment in the presence of the other employee. The proposition that Gebhardt made such a comment is hearsay, pure and simple.[1] Shields made it clear that he has no knowledge of any employee making such a comment, and Woodard has produced no affidavit, deposition or other evidence to support this proposition. Moreover, the issue in this case is not whether Gary Gebhardt harbored racist views. The issue is whether Woodard was subjected to a racially hostile work environment. Woodard has offered no admissible evidence to support that Gebhardt actually made the statement in question or even that it was allegedly made in the workplace.

The same analysis applies with equal force to Woodard's assertion that Gebhardt "even went so far as to say that if a black was brought to his camp he would kill him as well as the white person who brought him there." (Plaintiff's Brief in Opposition to MSJ, 4). Again,

Woodard has produced no admissible evidence to show that Gebhardt actually made the statement in question. In support of this proposition, Woodard cites page 107 of Cari Goodwine's deposition of January 29, 2005.[2] However, *on this very page of his deposition*, Goodwine made clear that Gebhardt ***never*** made any such comment in his presence. (Goodwine Depo. (1/29/2005), 107). Indeed, Goodwine confirmed that, during his entire employment at PHB, he never heard any employee use a racial slur. (Goodwine Depo. (1/29/05), 83; (2/12/05), 68). Instead, Gebhardt's alleged comment was reported to Goodwine by another employee named "Glenn." (Goodwine Depo. (1/29/2005), 108). However, Glenn did not tell Goodwine whether Gebhardt's alleged statement was made in the workplace. (Id.). Goodwine also acknowledged that he did not believe that Glenn ever reported the alleged statement by Gebhardt to anyone at PHB. (Id.) Furthermore, Woodard has offered no evidence that he had any knowledge of the hearsay statement attributed to Gebhardt. Statements allegedly made outside of the workplace are irrelevant, particularly where the plaintiff was unaware of the statement. Harden v. S.C. Johnson & Son, Inc., 167 F.3d 340, 345 (7th Cir. 1999).

       Thus, the record is devoid of admissible evidence that Gebhardt actually made the alleged offensive comment or that the comment was made at a time or place relevant to this action. Nevertheless, when PHB learned of the mere allegation that Gebhardt had made the statement, it terminated his employment. Ben Hancock, PHB's Human Resource Manager, learned of Gebhardt's alleged statement during the EEOC investigation and proceeded to terminate Gebhardt's employment. Hancock took this action even though there was no evidence

---

[1] Woodard is clearly offering the hearsay statement for the truth of the matter asserted. Woodard seeks to establish that Gebhardt actually made the statement in question. Shields was not present for Gebhardt's alleged statement and therefore has no personal knowledge as to whether Gebhardt actually made it. Instead, Woodard relies upon the other employee's statement to prove the truth of the matter asserted.

that Gebhardt had made the statement in the workplace. Based upon the "we"/"them" statement that previously had been attributed to Gebhardt and the alleged "hunting camp" statement, Hancock concluded that Gebhardt "was prejudice against minorities" and fired him for this reason. (Hancock Depo., 10-11; Hancock Affidavit, ¶17). Of course, the relevant inquiry is not whether Gebhardt was indeed prejudice, but, instead, whether Gebhardt's perceived views were ever translated into statements or deeds that amounted to racial harassment or discrimination actionable under federal law. On this issue, Woodard's case constitutes a complete failure of proof.

Notwithstanding the foregoing, Woodard goes on to make his most outrageous misrepresentations of the record on pages 6-7 of his brief. Here, Woodard states: "Gary Gebhardt has made numerous racial comments and a number of which were reported to management. However, it was not until Mr. Gebhardt threatened to shot and kill any Black who ventured onto his campgrounds that PHB bothered to discipline Mr. Gebhardt." Woodard cites no support for this incendiary statement. This statement is demonstrably false. The only comment allegedly made by Gebhardt to be reported to management was the "we"/"them" comment. In or around February 2003, Gebhardt allegedly commented to another white employee, Rob Tolhurst, "We have to make them work harder," allegedly in reference to Cari Goodwine. This comment was not made to Goodwine or Woodard or in either's presence. Rather, Goodwine testified that Tolhurst reported this comment to him. Goodwine interpreted this comment to be racial in nature, "we," meaning "white employees," and "them," meaning "black employees." (Goodwine Depo. (1/29/05), 54-56, 62-63).

---

[2] Woodard also cites pages 122-123 of the same deposition as support for the proposition that Gebhardt allegedly made the comment at issue. However, the alleged comment is not even addressed in this portion of Goodwine's deposition.

Goodwine reported the comment to his Shift Supervisor, Ron Sayers, who advised Goodwine that he would look into the situation and get back to him immediately. Sayers got back to Goodwine in less than an hour and advised him that he had spoken with Gebhardt and that he was going to consult the Union steward. Sayers also advised Goodwine that he had spoken to Rob Tolhurst and had asked about convening a meeting concerning the issue. A meeting followed. The meeting was attended by Goodwine, Gebhardt, Sayers, Tolhurst and Union steward Pete Lindsley. Gebhardt stated that he did not remember what he had said, but that whatever it was he did not intend it to be racial in nature. Gebhardt attempted to apologize to Goodwine and extended his hand to shake Goodwine's hand. Goodwine refused to shake Gebhardt's hand. (Goodwine Depo. (1/29/05), 56-59, 60-62).

After this meeting, Benjamin Hancock, the Manager of Human Resources, requested a meeting with Goodwine and his union representative. (Goodwine Depo. (1/29/05), 62). During the meeting, Hancock advised Goodwine that Ron Sayers had already brought the matter to his attention and that he was following-up on the issue. He specifically asked Goodwine what he thought should be done. Goodwine responded by telling Hancock "that's not my job to set out guidelines and punishments." (Goodwine Depo. (1/29/05), 62). Hancock met with Gebhardt, who asserted that he could not recall precisely what he had said, but that any reference to requiring "them to work harder" was to Die Cast Production Operators in general and had nothing to do with race. Hancock advised Gebhardt that he needed to be more conscious of his comments and how they might be understood or misunderstood by other employees. (Hancock Affidavit ¶12).

Thereafter, Hancock directed Gebhardt to attend a diversity training class at Edinboro University. PHB enrolled Gebhardt in the class at its own expense. Shortly before the

class was scheduled to begin, however, Edinboro University cancelled the class due to insufficient enrollment. Edinboro University did not reschedule the class and Hancock's efforts to locate a comparable course were unsuccessful. (Hancock Affidavit ¶¶ 13-14). Thereafter, PHB provided harassment training in-house to Gebhardt and its other employees. (Hancock Affidavit ¶¶ 15-16).

   **D. Woodard's characterization of Gordon Phillips' comment about opening a valve to a machine is legally irrelevant and factually unsupported.**

Woodard's next proffer of inadmissible evidence follows immediately on page 4 of his brief. Here, Woodard asserts: "Another foreman, Gordy Phillips joked about *allowing another Black employee to be exposed to extremely hot water which would certainly cause burning*." Again, this assertion is wholly unsupported by any admissible evidence and is contrary to the actual facts of record. Woodard cites pages 76-78 of Cari Goodwine's deposition for this proposition. On page 78 of his deposition, however, Goodwine confirmed that he did not hear any such "joke" by Phillips. Goodwine also confirmed that Phillips never did anything to expose him to danger. (Goodwine Depo., 78-79).

   The only admissible evidence in the record concerning this incident was provided by Gordon Phillips. Phillips recalls that, around 2001, while he was working as a Line Foreman, he was preparing a die cast machine for start-up. Water supply pipes or lines are part of these machines. While preparing the machine, he opened the main water valve of the machine not realizing that the hoses were disconnected. A huge volume of water shot out of the machine and soaked Phillips from head to waist. (The water cycled through the machine is cold, not hot as intimated by Goodwine.) Several employees and Phillips laughed about the incident because it looked like something out of "The Three Stooges." Phillips later joked that he should have had Goodwine , who was scheduled to work the machine once it was set-up, start the machine to see

whether Goodwine would have jumped as high as he did. Phillip's comment was facially non-racial and Phillips has confirmed that the comment had nothing to do with Cari Goodwine's race. According to Phillips, he would have made the same comment to anyone who was going to be running the machine. It was simply a joke and nothing more. (Phillips Affidavit, ¶22). Woodard's attempt to make this "incident" into a matter of race is palpably unreasonable.

> **E.    Woodard's statement that African American employees were exposed to direct threats of violence is factually absurd.**

Woodard's brief next makes the following dramatic assertion: "*There have even been direct threats of violence*." (Plaintiff's Brief in Opposition to MSJ, p. 4 (emphasis supplied)). Incredibly, as his only support for this proposition, Woodard cites a comment allegedly made by William Donnell, a white employee, to James Henry, another white employee. According to Henry, on or about January 1, 2004, he noticed a hole that was being excavated in the plant and asked Donnell what was going in the hole, to which Donnell responded, "Cari Goodwine, whoops, I shouldn't have said that." [3] (Henry Depo, 19-21). In his deposition, even Goodwine admitted that he has no basis upon which to believe that Donnell's comment was racially motivated. (Goodwine Depo, (1/29/05), 124). Instead, Goodwine believes that Donnell does not like him because, according to Goodwine, Donnell believes that Goodwine has asserted a frivolous claim against PHB. (Goodwine (1/29/05), 123-124). No reasonable person could perceive Donnell's comment as racial or threatening. Indeed, Goodwine himself acknowledged that no one ever threatened or intimidated him while he was employed at PHB. (Goodwine Depo. (2/12/05), 68). Woodard has offered no evidence whatsoever that any employee has ever

---

[3]    In the Goodwine case, Goodwine's counsel originally produced an affidavit from James Henry attributing this statement to William Hilbert, the President of PHB. After Henry admitted in his deposition that he did not write his affidavit and merely had it read to him, and that William Hilbert made no statement about Goodwine, Henry submitted a "corrected" affidavit. This corrected affidavit continued to espouse statements authored by Goodwine's counsel that Henry knew to be baseless.

committed or threatened any act of intimidation, physical or otherwise, against any other employee.

In his deposition, James Henry also confirmed that Donnell has never made a racial or racist comment in his presence or ever threatened violence against anyone. (Henry Depo, 23). Indeed, the record is devoid of any evidence that Donnell has ever taken any action or made any comment based upon a person's race. *Donnell said and did nothing to Goodwine or Woodard. He certainly said and did nothing that could be considered harassment under federal law*.

The federal courts have repeatedly recognized that anti-discrimination laws such as Title VII are not designed to purge all harassing or annoying behavior from the workplace; only that which renders the workplace objectively and subjectively hostile or abusive. Hartsell v. Duplex Products Inc., 123 F.3d 766, 773 (4th Cir. 1997) ("Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." (citations omitted)). Moreover, the Supreme Court has noted that the "ordinary tribulations of the workplace, 'such as the sporadic use of abusive language, … and occasional teasing' are not actionable." Faragher B. City of Boca Rotan, 524 U.S. 775, 778, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Here, the statement attributed to Donnell does not even rise to the level of abusive language or teasing. It is what it appears to be; an offhand racially-neutral expression of sarcasm made privately to a fellow employee by a person who is entitled to his opinion.

### F. The EEOC's determination does not support Woodard's prima facie case.

Woodard also relies upon the EEOC's determination in support of his claim. In its determination, the EEOC recited the factual basis for Woodard's claim as follows:

> [Woodard] alleged that [PHB] discriminated against him because of his race black in violation of Title VII of the Civil Rights Act of 1964, as amended. The alleged discrimination took the form of blatant racial slurs being made by coworkers and supervisors; being subjected to graffiti in the rest room consisting of a KKK sign and a burning cross; being given more difficult assignments than similarly situated white employees; finding chewed up sunflower seeds in his Gatorade; and finding his snacks smashed at his work station.

Determination Letter, Woodard EEOC file, Charge No. 172-2003-00954.

Ultimately, the EEOC investigator found that "the evidence obtained during the investigation establishe[d] a violation of Title VII with respect to hostile environment." However, the investigator rejected all other claims asserted by Woodard. For example, even the investigator recognized that although Woodard "frequently complained that he was given more difficult assignments, the investigation did not corroborate this allegation." The baseless nature of Woodard's discriminatory assignment allegation was further demonstrated by the computer records produced during discovery, which documented that Woodard's white counterparts were doing precisely the same work on the same machines for the same durations as Woodard.

Although the EEOC's investigator got it right with respect to Woodard's other claims, the investigator made two fundamental errors concerning the existence of a hostile work environment. The investigator failed to analyze the substance of the allegations regarding this claim and failed to apply the correct legal standard to the evidence. More importantly, the investigator lacked the detailed record developed during discovery in this case.

With respect to racial graffiti, the investigator stated that "[i]nvestigation found witness corroboration that offensive racial graffiti in the form of a KKK and burning cross was written on the rest room walls." However, the investigator either did not have or failed to consider the totality of the evidence concerning this issue, which overwhelmingly demonstrated that, if any graffiti was present during the relevant timeframe, it was de minimis and promptly removed. In the present case, Jamal Shields, Cari Goodwine and numerous other witnesses confirmed that they observed no racial graffiti at any time during their years of employment. Although George Arrington testified that he observed graffiti, he could not recall when, and he was not even present on the premises of PHB for the last two years and four months of Woodard's employment. Woodard has identified only one example of racist graffiti that he says he observed during his employment at PHB. According to Woodard, he observed a drawing depicting "a cross with a KKK" in one of the bathrooms at PHB. (Woodard Depo., 69). The image appeared to be drawn by means of a black ballpoint pen and was approximately 2 inches wide by 3 inches high. (Woodard Depo., 69). The fact that Woodard's fellow DCPOs, Goodwine and Shields, never saw this or any other item of graffiti demonstrates that, if it existed at all, it was sufficiently isolated and inconspicuous as to provide no evidentiary support for finding racial harassment of a severe and pervasive nature. Moreover, there is no evidence whatsoever that Woodard or any other employee reported racist graffiti to management and uncontradicted evidence that PHB regularly removed graffiti of any nature.

The EEOC investigator stated that, "[o]n several occasions during his employment [Woodard] complained about racially offensive comments made by supervisors and the manner in which he was assigned work, claiming he got all the difficult jobs." As noted, even the EEOC investigator concluded that Woodard's many complaints asserting allegedly

discriminatory assignments were without merit, and this conclusion has been fully corroborated by the work assignment records produced in this case. In contrast to the EEOC's correct conclusion regarding nondiscriminatory work assignments, the evidence generated through discovery in this case refutes the investigator's assessment concerning alleged racial statements in the workplace. According to the EEOC investigator, "[s]ome of the statements that [Woodard] complained about include the use of the words "nigger" and other derogatory comments such as "I don't associate with them kind" and " I don't watch football because it involves over paid *nigger* players." Determination Letter, Woodard EEOC file, Charge No. 172-2003-00954.

In his deposition, however, Woodard admitted that no employee ever used the word "nigger" in his presence. Instead, Woodard identified employee Albert Cropek as the source of his information. (Woodard Depo., 40-41, 61). However, in the statement supplied by Cropek to the EEOC investigator, Cropek stated that he ***never*** heard any supervisor use the word "nigger." This is entirely consistent with the testimony of Goodwine and Shields who both testified that they never heard a racial slur spoken in the workplace. Moreover, the EEOC file itself belies the conclusion that a hostile work environment existed at PHB. The statement prepared by the EEOC for African American employee Tobren Crosby states:

> I have not observed any racially offensive graffiti written on any of the walls of the plant, including the rest room. I have not heard any coworkers or supervisors make derogatory comments about black employees.

Woodard EEOC file, Charge No. 172-2003-00954.

Similarly, the statement prepared by the EEOC for African American employee James Lee Fowler confirms that he has "never seen any racially derogatory graffiti on the bathroom walls." While Fowler apparently did see disparaging graffiti based upon sexual

preference, Fowler reported to the EEOC that "[t]he company janitor usually paints over things like that soon after they appear on the walls."  Woodard EEOC file, Charge No. 172-2003-00954.

While it is true that, in modern society, harassment and discrimination can take more subtle forms than overtly racist statements and actions, vague and unsupported assertions such as Woodard's cannot meet the legal standard for imposing liability under Title VII.  A hostile work environment exists only when the "workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Nat'l R.R. Passenger Corp., 536 U.S. at 115, 116 (quoting Harris, 510 U.S. at 21).  The EEOC determination letter regarding Woodard's hostile environment claim is unsupported and frequently contradicted by the content of its own investigation file.  The letter completely ignores the legal standard applicable to Woodard's claim.  Moreover, it is Woodard's burden to sustain his claim based upon admissible evidence.  The EEOC file and, more importantly, the evidence of record simply cannot sustain any finding of liability against PHB in this case.

### III.   CONCLUSION

Based upon the evidence of record and for the reasons discussed above and in its principal brief, defendant, PHB Die Casting, is entitled to summary judgment on all claims of plaintiff, Dayved Woodard.  No genuine issue of fact remains for trial and PHB is entitled to judgment as a matter of law.

Respectfully submitted,

KNOX McLAUGHLIN GORNALL &
SENNETT, P.C.


BY: /s/ Richard A. Lanzillo, Esq.
     Richard A. Lanzillo, Esquire
     120 West Tenth Street
     Erie, PA 16501
     Telephone (814) 459-2800
     Facsimile (814) 453-4530
     Email rlanzillo@kmgslaw.com
     PA53811

     Attorneys for Defendant,
     PHB Die Casting

# 628991