**ROBERT M. WETTSTEIN, M.D.**
**401 SHADY AVENUE, SUITE B-103**
**PITTSBURGH, PA 15206**

--------------------------

**(412) 661-0300 (tel)**
**(412) 661-0333 (fax)**

August 22, 2005

John J. Gaughan, Esquire
O'Brien, Rulis, Bochicchio, and Sosso, LLC
DDI Plaza One, Suite 300
1225 Washington Pike
Bridgeville, PA 15017

Ref:    Dayved Woodard v. PHB Die Casting Inc.
        SS:    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
        DOI:   01-01-1999
        DOB: June 28, 1966

Dear Mr. Gaughan:

At your request, I performed a psychiatric evaluation of Dayved Woodard, a 39 year-old, single, African-American male, machine operator with PHB Die Casting Incorporated. The evaluation pertained to his pending workers' compensation and disability claim. The evaluation consisted of the following document reviews and interviews:

1.  Transcripts of workers' compensation hearings in this matter held July 7, 2004, December 15, 2004, and January 25, 2005.

2.  Complaint filed by the claimant in the United States District Court, Western District of Pennsylvania at 04-141E.

3.  Plaintiff's Answers to Defendant's Interrogatories and Request for Production of documents, in U.S. District Court, Western District of Pennsylvania at 04-141E.

4.  Deposition transcript of Patrick Camp taken February 22, 2005.

5.  Deposition transcript of Mr. Cari Goodwine taken March 21, 2005.

6.  Deposition transcript of Dayved Woodard taken February 21, 2005 and February 25, 2005.

7.   Deposition transcript of James Henry, in <u>Goodwine v. PHB</u>, U.S. District Court at 04-142E, taken March 25, 2005.

8.   Handwritten letter by the claimant to Mr. Dampier, six pages.

9.   Typewritten letter to Susan M. Kelly from the claimant dated October 5, 2003.

10.  Occupational medicine records from the Occupational Health Center, with medical record forms, clinical observation records, and emergency department records of Hamot Medical Center, 1998-2002.

11.  Psychological reports prepared by Ted Urban, Ed.D., dated January 22, 2004 and June 28, 2004.

12.  Office psychology records from Jerome L. Troncone, Psy.D., May 2000.

13.  Psychiatric interview with the claimant on April 25, 2005 with administration of the self-report Beck Depression Inventory, and telephone interview on June 30, 2005 (total 6.0 hours).

14.  Administration of the Millon Clinical Multiaxial Inventory (MCMI-III) on April 25, 2005.

15.  Administration of the Minnesota Multiphasic Personality Inventory (MMPI-2) on April 25, 2005.

16.  Occupational Health Center records, Erie, PA, with Medical Report Forms, 1998-2002.

17.  Office psychotherapy records from Ted Urban, Ed.D., July 2003, to June 2005.

18.  Outpatient/emergency department medical records of St. Vincent Health Center, Erie, PA, 2000-2001.


I attempted to interview Ted Urban, Ed.D., by telephone, but he left me a message that the claimant and claimant's counsel had instructed him to refuse this interview.

PRESENTING PROBLEM

According to available documents and interviews, the claimant was hired in February 1998 as a die cast machine operator at PHB. He was employed there full time until injuring his left shoulder with tendonitis in November 2002 and was off work with Sickness and Accident benefits until returning to work in October 2003 for one week. He has not worked at PHB since then. He subsequently filed a workers' compensation claim, a Sickness and Accident claim, and a federal lawsuit alleging racial harassment and discrimination in the workplace at PHB.

In previous testimony and in the present psychiatric interviews, the claimant alleged that he was subject to racial harassment and discrimination as an African-American male even from the time of his initial interview. In particular, he alleged that Ronald Sayers, his shift supervisor on alternate weeks assigned him disproportionately difficult jobs at the plant. The claimant noted that Mr. Sayers did not directly say anything racist to him though was nevertheless "my biggest problem" there. He alleged that there were near daily incidents that "don't sound racist but were racist," and that Mr. Sayers "singled him out." On one occasion, Mr. Sayers sent him home for a scheduled overtime Saturday shift, for which he was later in part compensated, without explanation. The claimant alleged that coworkers were able to see Mr. Sayers' racist behavior toward the claimant and it became a joke to them. The claimant became particularly stressed when he was working light duty due to an injured ankle and Mr. Sayers "made life miserable for me" by assigning him clean-up tasks in different areas of the plant in a demeaning manner by escorting him around with a stool. The claimant alleged that Mr. Sayers assigned to him the most difficult jobs to deliberately frustrate him and make him quit, though he did not let on to others about his distress. Another African-American male employee, Jamal Shields, allegedly told the claimant to report Mr. Sayers' behavior, though also encouraged the claimant to placate Mr. Sayers and be passive rather than assertive about the alleged harassment and discrimination at the workplace. The claimant characterized his relationship with Mr. Sayers as "volatile." The claimant recalled an incident in 2002 when Mr. Sayers berated and warned the claimant for going to lunch early, but did not warn coworkers who were also present.

The claimant alleged that his other shift supervisor, Rex Ryan, also occasionally assigned him the more difficult tasks or "rided me," though the claimant had less difficulty with him than Mr. Sayers. The claimant noted that Mr. Ryan once demanded that he write a letter after the claimant had broken some drill taps which angered the claimant since he believed that others did not have to write such a letter. The claimant characterized Mr. Ryan as "arrogant," and recounted how Mr. Ryan "dared" the claimant to bring a lawsuit against the company. He alleged that Mr. Ryan also "singled out" the claimant, and "had it out for me." The claimant disputed Mr. Ryan's allegations and testimony that the claimant's work performance was mediocre and unenthusiastic.

The claimant alleged that he was once threatened with bodily harm by John Magee, who relieved him for a twenty-minute lunch break and instructed the claimant not to be late. The claimant recounted the incident in which, following a lunch break, Mr. Magee threatened him and "said he'd kick my ass." The claimant replied with a

similar threat to Mr. Magee. Mr. Magee later told Mr. Ryan that the claimant had threatened Mr. Magee, and Mr. Ryan confronted the claimant about this without subsequent discipline. The claimant reported to me that over time it became clear to him that Mr. Magee had a "race problem" other than being "real cocky" generally.

The claimant reported that he was once physically grabbed by Rick Bartosick, his line supervisor. In this incident, the claimant had been distressed about Mr. Sayers' behavior, but did not wish to discuss his feelings about Mr. Sayres with Mr. Bartosick. Mr. Bartosick "pressed the issue," and demanded that the claimant discuss his problem with Mr. Sayers with Mr. Bartosick but the claimant attempted to walk away. Mr. Bartosick grabbed the claimant's arm, prompting the claimant to state, "touch me again and see what happens." After this incident, the claimant kept a stainless steel knockout pin at his work station for protection against assault by a group of coworkers.

On other occasions, the claimant reported hearing secondhand information that Tom Thompson, and other employees, had said "nigger" in talking to one of the claimant's friends. The claimant stated that he had a meeting with Human Resources Director Ben Hancock about this, but Mr. Hancock stated to the claimant that they would not do anything about it since Mr. Thompson did not direct his remarks to anyone in particular and that many coworkers have used such language. After hearing this response from Human Resources, the claimant stated that he stopped reporting such incidents. On one occasion, he went to Human Resources staff member Shelley Antolik about race discrimination issues at the workplace.

The claimant testified that, in 1999, he was improperly excluded from working on the machines for a particular PHB customer, Rex Roth, though was later included in an attempt to placate him.

On another occasion, an employee, Bill Diehl, asked the claimant whether he was white or black, and indicated that he was too light to be black and too dark to be white. He stated that several coworkers used the expression "you people" to refer to African-Americans, to his face, but never used the word "nigger" in his presence. The claimant reported that his white coworker friends told him that racially derogatory comments had been made at the workplace. He stated that he never saw any sign posting on the wall relating to race or sex discrimination and harassment.

The claimant stated that he saw a burning cross with a "KKK" above the bathroom urinal on the wall in 2001. The bathroom in question contained a single toilet, sink, and urinal. He described this as approximately three inches tall, written ballpoint pen. He indicated that this remained present on the bathroom wall for several months, and was not the same burning cross that was two feet tall that was painted over by janitor Rodney Burry in the late 1990s. On other occasions, he found chewed up sunflower seed shells spit into his Gatorade at his workstation, and a bag of his animal crackers was smashed.

The claimant alleged that another employee asked him one day if he was going to do any drive-by shootings because he was wearing a stocking cap on his head to protect hair. Another coworker reportedly asked him if he was going to go take care of his drug deals when he needed a bathroom break. As a "joke," one coworker wrote "kill

whitey" on the claimant's work station and in the work bathroom in red marker, which "offended" the claimant.

The claimant indicated that he had never previously encountered this much racism and discrimination in the workplace as he had at PHB. He described himself as "not their kind of black male, I spoke up when violated." He described hearing about verbal abuse of other minorities at work including an Iraqi man and a Puerto Rican man, both of whom came to the claimant to report their experiences there to him.

The claimant indicated that Gary Gebhardt was the only employee who, to his knowledge, was terminated for racial insensitivity or harassment at PHB. The claimant heard from others that Mr. Gebhardt had referred to blacks as "niggers," had been warned about this, and "made it clear that he did not like blacks." The claimant reported to me that he never heard Mr. Gebhardt use racial slurs. The claimant also denied that any PHB employee used the word "nigger" in his presence. The claimant testified that, in 2001, Mr. Gebhardt had instructed only him, not the white employees, not to walk through a maintenance area of the plant on his way to lunch.

The claimant explained that he had at least two meetings with Butch Smith, Mr. Sayers' supervisor. He was called to these meetings because of his "attitude" toward Mr. Sayers. Mr. Smith reportedly did not respond to the claimant about an investigation into his allegations of racial issues.

The claimant had several meetings with union stewards or presidents to decide how to report these alleged experiences, and some of these meetings involved Mr. Sayers as well. The claimant filed no written grievance with the union about the alleged racial harassment and discrimination, but he filed a grievance challenging the denial of his Sickness and Accident benefits.

The claimant filed an EEOC complaint against his employer. The Determination dated December 18, 2003 concluded that there was a violation of Title VII with respect to hostile work environment due to the presence of offensive racial graffiti, and derogatory racial remarks about black employees and black people in general, made by supervisors and coworkers. However, those comments were not directly made to the charging party, according to this determination. Further, the Determination could not corroborate the claimant's allegation that that he had been given the more difficult work assignments, or that his smashed snacks were the result of his race, or that having to write a letter following a breakage problem with the equipment was an indication of discrimination.

In his 2003 correspondence with the Erie County Human Relations Commission (Mr. Dampier), the claimant alleged that he saw the work environment as characterized by "blatant harassment and discrimination, though others may see it as only subtle."

The claimant reported that, approximately one year after he began working at PHB, he became severely emotionally distressed regarding these alleged experiences. He developed a strong dislike toward coworkers and supervisors and no longer enjoyed working there. This affected his attitude, performance, and attendance. He feared going to work, losing his temper, and hurting someone, particularly Mr. Sayers. He developed persistent, violent, and homicidal ideation, and dreams about hurting his supervisors, two or three times a week each week. He became irritable, sad, socially

withdrawn, and lost contact with friends. He experienced generalized anger, rage, and agitation. He threw and broke household objects at home. He had difficulty falling and remaining asleep, and had decreased concentrating and focusing. He became preoccupied with these alleged work experiences of harassment and discrimination, and experienced intense distress when he saw coworkers outside of work. He became detached and estranged from others including his many white friends.

His primary care physican referred him to a psychologist, Jerome Troncone, Psy.D., in 2000 whom he saw for several sessions. The claimant reported to me that he told the psychologist about the racism at PHB, but that the psychologist told him that he was unable to assist him with that, and the claimant stopped going to the treatment sessions. However, the office records from Dr. Troncone indicate that he saw the claimant on five occasions in May and June 2000 for what he diagnosed as major depressive disorder single episode. Progress notes from these sessions note that the presenting problem was depressive symptoms including decreased appetite and weight, anhedonia, insomnia, suicide ideation two years earlier, worthlessness, and helplessness. At the time, the claimant was living with his sister because of his financial obligations of child support payments. He reported that he found his girlfriend cheating on him, and he was suffering from the death of an uncle and the death of a friend's son. At the time, he feared abandoning his children, and his relationships with his children were his paramount concern. There were related issues from his own childhood regarding his father; one note indicates that his father's 1976 death "eats me up a lot." He reported that in the late 1980s before his older daughter was born, he was "fun, spontaneous...lots of goals...big dreams." In contrast, after children, his life has "been hell, angry-bitter, lost site of dreams, disappointed and worthless, personal prison." None of the records, however, contains any references to work problems, issues, or alleged racial discrimination or harassment, other than he was not able to see his daughters because he was working second shift at PHB. His job was described as "his biggest obstacle." He described a "history of failures."

The claimant was off work for shoulder tendonitis from November 2002 until October 2003. In July 2003, his primary care physician referred him to Ted Urban, Ed.D., a licensed psychologist, who has been providing individual psychotherapy since then. Though the claimant was out of work at the time, he was anticipating returning to work and feared loss of impulse control at work. He was able to return to work for only one week in October 2003 and has not worked since then at PHB. In that week, he kept to himself, but he told me that one coworker "nagged" him and wanted the claimant to discuss his case with him, but the claimant refused. He had no other adverse work experiences that week. His only other work experience since then was approximately one-week's employment at a Holiday Inn Express in Erie on the third shift. He became enraged when a coworker there made a derogatory comment about the rap music that was playing at the time, and the claimant did not return to work there because of his worsened anger at the situation as well as having to work on the third shift.

The claimant has not received psychotropic medication to help him manage his emotional distress. His primary care physician provided him samples of Lexapro 10 mg, though the claimant only took a single dose before experiencing nausea and dizziness.

He explained that he fears adverse drug reactions and wants to pursue treatment without medication though he has been told that it would be helpful to him. Dr. Urban's progress notes frequently indicated that psychotropic medication was "not indicated." Treatment sessions with Dr. Urban have continued through the present time at reduced frequency, once or twice a month, due to the unavailability of insurance and income. In a report dated January 22, 2004, Dr. Urban diagnosed the claimant as having post traumatic stress disorder (PTSD), delayed onset, chronic type, attributable to his alleged racial harassment and discrimination at work. Follow-up report of June 28, 2004 reaffirmed that diagnosis and indicated that the claimant had made "limited progress" in managing his depression and anxiety which have waxed and waned." The claimant had become distressed at his lack of employment and income, homelessness, and inability to provide for his two daughters though he was no longer experiencing homicidal ideation as of that date.

In the psychiatric interviews, the claimant reported his continued emotional distress at these alleged work events. He noted that his depressive dysphoria has partly improved though he continues to be generally angry and tense at coworkers and at the outside world. He has continued violent ideation and homicidal ideation. He has difficulty falling and remaining asleep though can sleep for several hours at a time, which is an improvement over his earlier experiences. His sadness has decreased, but his anger remains prevalent. His violent dreams are less frequent than they were earlier. He no longer naps during the daytime. He continues to avoid seeing coworkers or the PHB facility because he fears loss of control if he saw them. He explained that he once saw Ben Hancock at the YMCA and felt "ready to hurt him" but did not do so. He explained that he does not believe that his coworkers and supervisors are "safe in my presence" though made no direct threats to injure anyone. He explained that he "feels assaulted, scared, and violated...I want them to feel my pain...I need to show them and prove my pain...I feel attacked due to being an African American...I want justice and hope the law won't let me down." He remains irritable, less interested in others, indecisive, and lacks motivation. There has been no change in appetite or weight. There are no psychotic signs or symptoms such as hallucinations. He remains "hypervigilant" about his safety and was previously checking his personal vehicle. He explained that he was not a frequent complainer at work except with regard to Mr. Sayers. He knew that he needed the income from work, and attempted to suppress his emotional distress about the alleged work events. He continues to have difficulty focusing and believes he would not be able to return to a college classroom setting. However, he noted that he does want to work though has not been searching for employment. He fears hurting someone at the workplace if they said the wrong thing to him. He does not want to take medication "that could mess with my brain." He explained that he would not be able to return to PHB for employment because "even seeing them would trigger increased rage." He explained that "I'm ready to grab someone." He had a physical encounter with one of his high school student athletes in the week prior to the interview in which the student threatened him and the incident was broken up by witnesses. Though it was not a racially based incident, the claimant explained that he had difficulty calming his anger from that incident.

The claimant described his premorbid personality as someone who was "fun-loving, outgoing, social, curious for knowledge, free-spirited, friendly, loyal, and perfectionistic." He described being happy with himself and having a steady job and a hope to later attend college. He denied having a temper or anger management problems prior to working at PHB.

Review of hearing and deposition transcripts from the claimant's employer disputes the claimant's account of the alleged work events at PHB. Mr. Sayers testified that he had "no personal problems" with the claimant or that he was black. He testified that the claimant left his machine for longer than desired, but that there were no other performance or attitude problems at work, and that the claimant was not disciplined because of poor performance. He denied attempting to make the claimant's work difficult, assigning him difficult jobs, making derogatory comments about the claimant, or hearing that coworkers made derogatory or racist comments to or about the claimant. He denied following the claimant around from stool to stool to supervise him on light duty as the claimant has alleged, and indicated that he regularly monitors all of his supervisees. He denied singling out the claimant when instructing him to write a letter for the file about equipment damage. He testified that, generally, he did not treat the claimant differently from others. The claimant did not complain to him that racial slurs were verbalized at work, though Mr. Sayers has heard racial slurs at work. He had about three meetings with union representatives about the claimant.

Mr. Rex Ryan testified that the claimant "complained a lot" at work about his assignments and did not keep up with the work load, giving the appearance that he "didn't act to me like he wanted to do it." Mr. Ryan did not observe any coworkers using racial slurs, making derogatory remarks, or picking on or harassing the claimant. The claimant did not complain directly to Mr. Ryan about being treated unfairly at work. He denied disproportionately assigning difficult work to the claimant. He testified that the claimant left his work station for longer than expected intervals, and that, "we'd have to go look for him." He did not see a burning cross or KKK written in the work bathroom. During the claimant's employment, Mr. Ryan did not know of the claimant's discrimination complaints.

Mr. Loren ("Butch") Smith, a direct supervisor of Mr. Sayers and Mr. Ryan, testified that that he did not hear or see coworkers making derogatory or racial comments toward the claimant, or harassing him. He examined computer records and could not detect any difference in the claimant's work assignments relative to others. He observed derogatory comments written on bathroom walls about employees, but nothing about the claimant, or anything racially oriented. He talked to supervisors to substantiate the claimant's allegation that coworkers had used the "N" word on the floor, but found that, "no one could back up Dayved's claim that they had heard that word."

Mr. Rodney Berry, a janitor at PHB for 15 years, testified that he saw a burning cross with a KKK in the men's bathroom stall in the late 1990s, about one and one-half feet high and over one foot wide written in marker. He spray painted it the next day. He indicated that it could not have been present for months, and that it was not directed to the claimant.

## ACTIVITIES

As noted, the claimant has had no regular employment since October 2003, and no substantial income. At present, he is receiving food stamps and public assistance. Since January 2005, he has been living in a two-bedroom apartment rented by a 32 year-old female friend, with whom he is not romantically involved. She is a high school track and Spanish teacher. He coaches track in the spring season, and has done so for the previous two years, currently being paid $625 for the season. He attends and coaches practice approximately six days a week and enjoys this distraction from his emotional distress relating to the above described work events. Otherwise, he exercises six days a week for two hours a day on a treadmill, and lifts weights at a YMCA. He also swims, rides a bicycle, does martial arts, and uses a punching bag to relieve his stress and anger. He has recently attended Yoga classes to relax. He has previously attempted to study to prepare for certification examination as a personal trainer but has abandoned this due to his difficulty focusing and studying. For financial reasons, he no longer has a vehicle. His activities are also limited because of his finances. He sees friends occasionally but much less frequently than in earlier years. He reads a daily newspaper, watches television, occasionally goes to the movies, but does not use a personal computer. He continues to avoid others, including long time friends, and has not dated in more than one year. He sees family members at holidays, and talks to them regularly.

## SCHOOL AND WORK HISTORY

The claimant attended public school for his primary education except for sixth grade when he attended a Catholic school. He described himself generally as a good student. He failed one political science class in eleventh grade but passed the year. He graduated in 1984 and did not know his class rank. He denied any diagnosis of learning disability, attention deficit disorder, or special education programming. He was once suspended from school for three days after telling a teacher to "shut up" in his senior year. She had verbally antagonized him prior to this outburst.

From 1985 to 1987, he attended the University of Pittsburgh in Oakland in the architectural studies program. In high school, he played football for two years, track for four years, wrestling for one year, and cross-country for one year. In college, he participated in the track team in both freshman and sophomore years, but the track coach reportedly had difficulty with the claimant. In his freshman year, the coach did not ask him to return one day following a practice. In his sophomore year, the claimant quit the team because the coach again gave him "a hard time." Otherwise, the claimant described enjoying his college years which he abandoned due to financial reasons and difficulty with the track team coach. He has never served in the United States military.

The claimant has had a variety of short-term positions. In 1987, he moved to Victorville, California with a male friend and worked in a Warehouse record store for six months. He returned to Erie, but returned to California in 1991 with a girlfriend, and they lived there for six months while he worked at a U.S. Air Force base as a delivery

and messenger man. His employment otherwise has occurred in Erie, including landscaping and building maintenance positions.

The claimant's longest previous employment was at ND Entertainment Company where he was a materials handler from May 1993 to May 1997. The position ended when the company relocated to California. Immediately prior to his employment at PHB, he was employed at PSB Industries where he was a materials handler until February 1998, earning $6 an hour.

The claimant reported that his only previous work discipline occurred at a plastic's company in 1993 when he was late to work and there was a mutual agreement between him and the management that he would leave his employment. He denied any previous racial harassment and discrimination at work.

FAMILY HISTORY

The claimant was born and raised in Erie and has lived in Erie for all but one year of his life. He was the second of five children born to his mother. He, his older sister, and younger sister shared the same father. His parents were separated when he was approximately two or three years of age, and he indicated that his father was reportedly "a playboy." After his parent's separation, he remained in Erie with his mother and sisters, while his father moved to Michigan. In February 1976, his father was fatally shot by a former girlfriend who wanted him back. She was reportedly prosecuted and incarcerated, but is now deceased. At the time, the claimant had not had any contact with his father for years, and indicated that his father's homicidal death did not affect him. In contrast, however, he informed a treating psychologist in 2000, that his father's death "eats me up a lot." At the time, he described his family as "dysfunctional." He noted that he grew up without a father or missing one. Later, his mother had one of his younger sisters and his brother through two other men, neither of whom lived with the family. All of the five children, however, were raised by his mother. She remarried in 1995 to a church pastor whom she met in 1987.

The claimant described his mother as a very strict but no nonsense woman who was strong but appropriately spanked the children as needed. He described her as "the man and the woman of the house." He remains close to her, at 58 years of age, and sees or talks to her regularly in Erie. He remains close to his other sisters all of whom live in the vicinity except for his youngest sister who lives in Alabama. All of his siblings have children. One sister's fiancé works at PHB. His mother was employed as an electric meter reader from 1978 until she retired in 1997. He described his growing up years as impoverished though they did not realize that they were poor at the time. They lived in public housing until his mother became employed in 1978.

The claimant's half-brother has had multiple criminal arrests since his teenage years and multiple incarcerations. The claimant described him as a "career criminal" who has also abused and sold illegal drugs. He dropped out of high school. Though his previous crimes involved property rather than persons, his most recent offense was armed robbery, breaking and entering, and pistol-whipping which led to a current criminal sentence of 18 to 36 years. The claimant indicated that he has visited his

brother just once while incarcerated several years ago. The claimant did not know the nature of his brother's drug problem or whether he had participated in any substance rehabilitation. However, there is no family history of mental health or substance abuse disorder, or involvement in the criminal justice system. The claimant indicated that his family members have offered to have him live with them though he has refused to do so and does not want to be a burden to them.

The claimant denied any significant involvement in the criminal justice system. When fifteen years-old, he and his friends threw a rock at a window of a bar, and broke it, though was not caught. At age seventeen, he was arrested for public urination at a high school football game where there were no bathroom facilities. He spent several hours in jail and had to pay a fine for this event. In 1991, he was sitting on a porch at a party when passers-by yelled and called him names. He and his friends got into a vehicle, and the claimant threw an unopened, beer can at the vehicle attempting to strike the male passenger sitting in the front seat but instead hit the female driver. At the time, the claimant had been intoxicated with alcohol. Criminal charges were initially brought, but dropped when he paid the $1,200 medical bills for the victim who did not require surgery. He denied any other involvement in the criminal justice system.

The claimant denied frequent fighting as a youth. He was involved in a single fistfight with another track team member, at his high school locker room, who confronted him about something the claimant had said. The other individual struck the claimant first, and they had a brief fight until others intervened, and neither suffered injuries.

In 1990, the claimant had a "one night stand" with a white female which gave rise to his older daughter, born in 1990, now age fourteen. The claimant stated that he did not even know his daughter existed until she was approximately three years of age. Since then, he has been actively involved as her father though she lives with her mother. He initially provided child support payments until her mother went to work. He indicated that he never got to know his daughter's mother and has never been romantically involved with her.

The claimant had a live-in relationship with another woman, another white female, and lived together from approximately 1988 to 1993. At approximately the time they broke up, she announced that she was pregnant, and gave birth to their daughter in 1994, now age eleven. The claimant also described an amicable relationship with his younger daughter's mother, but they have not been romantically involved since they broke up. He also was paying her child support until his current unemployment. His daughters remain close to each other and see and socialize together despite having different mothers and residences. He was spending overnights with them in his home during his employment at PHB. Since his unemployment, he has not had overnight visits with them but occasionally sees them during the daytime because of the absence of any location to have them stay with him.

From 1993 to 1997, he lived with another white female though they grew apart. In 1999, he moved in with a Puerto Rican female for one or two months but he ended the relationship. He has not dated seriously in the last year or so due to his current emotional distress.

## MEDICAL HISTORY

The claimant described himself as a healthy man without significant illness. His only surgery occurred in 1990 when he underwent repair of a torn tendon on his left middle finger. At work, he sprained his ankle and injured his knee. On another occasion, he bumped his head and missed a day of work. On still another occasion, some metal flash was blown into his eye at work. His only significant medical problem has been tendonitis of his left shoulder which he attributed to working conditions, though PHB denied its work relatedness. He was treated with Motrin and two cortisone shots and was out of work from November 2002 to October 10, 2003 during which time he was managed conservatively. MRI scan of the shoulder revealed no rotator cuff tear. He described himself as 90% healed when he returned to work in October 2003. At present, he stated that he has some residual left shoulder pain but is able to exercise regularly with weight lifting. While out of work, he received sickness and accident benefits which were limited to one year. He has had several motor vehicle accidents without head injuries or hospitalizations.

Previous drug use included twice use of marijuana without other illegal drug use. He has been intoxicated with alcohol in the past but only rarely uses alcohol at present.

## MENTAL STATUS EXAMINATION

The claimant was initially informed of the nature, purpose, and nonconfidentiality of the evaluation process and agreed to and understood this. He drove himself to and from the interview from Pittsburgh and appeared in a timely manner for it. He denied taking any prescription medications at the time of the interview.

The claimant appeared as a neatly dressed and groomed, clean-shaven, healthy, light-skinned, African-American male approximately his stated age. He stated that he stood at five foot, nine inches tall and weighed 165 pounds. He wore eyeglasses, blue jeans, and no jewelry, body piercings, or tattoos. His speech was conversational, coherent, spontaneous, and open. There was no disorganization of his speech or thinking, and no signs of psychosis such as hallucinations, delusions, thought disorder, or bizarre behavior. He spoke in a normal pace and volume without pressure of speech, flight of ideas, or loose associations. He had a full range of emotions and emotional expressions and frequently smiled or laughed. He reported that his primary emotional state was anger, though there was minimal overt anger in the interview. There was no depressive dysphoria, tearfulness, sadness, restlessness, irritability, or agitation. He scored a 15 on the self-report Beck Depression Inventory indicating the presence of mild depressive symptoms for the prior week. He denied suicide ideation, intention, or plan

No formal, written, cognitive testing was conducted but he was alert and oriented to person, place, date of birth, social security number, and situation. There was no evidence of impairment of attention, concentration, or memory in the interview. He easily and accurately performed serial three and serial seven subtractions. He was able to recite the alphabet correctly in the forward direction and in the reverse direction

John J. Gaughan, Esquire
Page 13
August 22, 2005

without error. He appeared to function at an estimated at least average level of
intellectual capacity and verbal skill. He did not fatigue during the lengthy evaluation
day with one-half hour break. He had no abnormal involuntary movements,
mannerisms, gestures, or tics. He presented in a straightforward manner without
obvious attempts to manipulate the interview. He talked about the alleged racial
harassment and discrimination at work with minimal prompting and hesitation.

PSYCHOLOGICAL TESTING

The claimant completed the MMPI-2 as part of this psychiatric evaluation. It was
computer scored by a licensed psychologist and was considered valid by a computer
program. He responded adequately with the evaluation to provide useful information
though he was somewhat inconsistent in his responses to the test items. His high point
clinical scales were Paranoia with elevations of Depression, Psychasthenia, and
Psychopathic Deviance scales. His profile was not well defined though he was angry
and depressed at this time. He has feelings of inadequacy and uncertainty about the
future, is sullen, and believes that others have harmed him. He blames others for
working against him and does not accept responsibility for his own mood. He has low
energy, functions inefficiently, and is likely to be tense, irritable, preoccupied,
remunerative, and resentful. He feels depressed, useless, and pessimistic about the
future. The test interpretation noted that his resentment may result in part from his
tendency to misunderstand others' motives. He has paranoid personality features
which are likely to persist. He views his physical health as failing and reports numerous
somatic concerns. He feels that life is no longer worthwhile and fears losing control of
his thought processes. He views the world as a threatening place and feels as though
he has been unjustly blamed for others' problems. He endorses significant general
anxiety. He is shy and introverted and tends to avoid interpersonal relationships, and
sees himself as vulnerable to being hurt by others. He is distrustful, and feels angry
that he is so alone. His lack of trust may prevent him from developing warm and close
relationships, and interfere with mental health treatment. His anxiety may make it
difficult for him to function effectively or think clearly.

The clamant completed the MCMI-III as part of the psychiatric evaluation. The
test items were computer scored and reviewed by a licensed psychologist. The
claimant provided a valid profile. The test data suggested a clinical syndrome, Axis I,
diagnosis of generalized anxiety disorder because of his reported restlessness, anger,
irritability, and physical symptoms. Personality configuration was composed of
narcissistic personality disorder with schizoid and schizotypal personality features which
reflect long-term chronic traits likely to have persisted for years prior to the present
assessment. Testing described him as an egocentric man, with inflated sense of self-
importance, resentful and arrogant attitudes, a socially intimidating manner, and
insecurity about his self-image. He experiences others as belligerent and antagonistic,
which justifies his own defensiveness. He is seeking recognition, admiration, and
power, and has difficulty with intimacy and closeness. The test data indicated that he
may be characteristically jealous, touchy, hold grudges, and likely to ascribe malicious

tendencies to others. He may distort and magnify the remarks of others into major insults and purposeful slanders. He reported feeling empty and hollow.

DIAGNOSIS

According to the Diagnostic and Statistical Manual published by the American Psychiatric Association (DSM-IV), the claimant can be presently diagnosed as follows:

| Axis I | Adjustment disorder with mixed anxiety and depressed mood. |
|---|---|
| Axis II | Personality assessment and diagnosis deferred; schizoid and narcissistic personality traits. |
| Axis III | No contributory medical problems. |
| Axis IV | Current stressors include unemployment; financial; and work. |

An adjustment disorder represents the development of emotional or behavior symptoms in response to identifiable stressors which are clinically significant. Adjustment disorder symptoms are behaviors characterized by marked distress that are in excess of what would be expected from exposure to the stressor, or significant impairment in social or occupational functioning. The claimant was diagnosed by a psychologist in 2000 as having a major depressive disorder single episode nonpsychotic type when he reported depressive symptoms related to family issues rather than work. No diagnosis of PTSD was made at that time.

A diagnosis of PTSD is not made due to the absence of an event or events that involve actual or threatened death or serious injury or a threat to the physical integrity of self or others despite the presence of other PTSD symptoms such as reexperiencing of emotionally disturbing events, persistent avoidance of stimuli associated with an emotionally disturbing event, and increased arousal.

Psychological testing performed as part of the current psychiatric evaluation provided additional possible psychiatric diagnoses including generalized anxiety disorder, major depressive disorder, dysthymic disorder, narcissistic personality disorder, schizoid personality traits, schizotypal personality traits, and paranoid personality traits.

CONCLUSIONS

This 39 year-old, single, African-American male was working at PHB from 1998 through October 2003. He has repeatedly alleged that he was exposed to a racially hostile work environment, and was discriminated against on racial grounds when given adverse work assignments, though the employer has denied doing so. He heard of racial slurs made by coworkers and supervisors, though these were not directed toward him. He reported these events to union officials, and had several meetings with Human

Resources personnel or supervisors, without any subjective sustained relief from further racial hostility or discrimination. I did not evaluate any of the claimant's coworkers and did not review his work assignment records; I have no psychiatric opinion regarding whether the claimant's work assignments and supervision were racially motivated or discriminatory, or even whether he was in fact "singled out" for whatever reason by his coworkers and supervisors as he alleges.

The claimant reported developing severe emotional distress as a result of these alleged work experiences, diagnosed as PTSD by his treating psychologist. That diagnosis is not appropriate based upon the absence of any traumatic event involving actual or threatened death or serious injury, though the specific symptoms are otherwise consistent with PTSD. Other psychiatric diagnoses should be considered, including adjustment disorder, dysthymic disorder, major depressive disorder, and personality disorder. No matter what the precise psychiatric diagnosis, his symptoms are sufficiently severe, of substantial duration, and have resulted in functional impairment to represent a mental disorder.

The claimant has not had previous substance abuse, or psychiatric treatment, though he was seen by a psychologist for five visits in 2000, complained of depressive symptoms, and was diagnosed as having a single episode of major depression but not an anxiety disorder. At the time, he was dealing with issues relating to his children and a girlfriend, and complained that his working second shift at PHB interfered with his visitation. I am not aware of any life events or stressors other than work and family which could have contributed to or caused this specific adjustment disorder. It is possible that the claimant initially became dissatisfied with his employment on other than racial grounds, but that he later consciously or unconsciously seized upon a racial interpretation as the cause. He was stressed by his need for income to support his two daughters with whom he was close, and this stressor may have contributed to his overall anxiety and fear of job loss. It is likely that some of his anger is pre-existing, and may be related to his family of origin and the loss of his father, though he denied a history of chronic anger prior to his PHB employment.

The course of the psychiatric disorder is now chronic in that it has lasted several years. Unfortunately, the claimant has refused to accept prescription psychotropic medication which would likely be useful to him in reducing his irritability, depressive dysphoria, anger, and accompanying functional impairment. His participation in individual psychotherapy has been appropriate though is not presently of sufficient frequency due to financial limitations.

The claimant has been inconsistent in some of his reported emotional experiences, and this raises the question of manipulation of the interview data for purposes of litigation. As noted, he informed a treating psychologist in 2000 that his father's death was still problematic for him. In contrast, he told me that his father's death was not an important psychological issue for him. Similarly, he presented in 2000 with a history of depressive symptoms related to family problems rather than alleged racial harassment and discrimination, but he told me that he presented to that psychologist due to his anger at PHB resulting from the racial harassment and discrimination.

The claimant returned to work at PHB in 2003 after recovering from a shoulder injury. He only worked for five days, and I am unaware of any work incidents during the week prompting his leaving work except for one coworker who wanted the claimant to discuss his case. Due to the claimant's persistent, intense anger at coworkers and the employer which has not substantially responded to psychotherapy, it would not be appropriate to return him to the PHB workplace, and I would consider him unable to do so from a psychiatric standpoint. However, it is likely that he would be employable at other workplaces so long as they were substantially free from racial insensitivity, hostility, and discrimination. The claimant, however, fears exacerbation of his anger and rage leading to violent behavior. The prediction of future violent behavior is complex and largely inaccurate. I note that the claimant does not have a history of significant previous violent behavior, involvement in the criminal justice system, antisocial personality traits, and substance abuse or dependence disorders, all of which are substantial predictors of future violent behavior. Given the lengthy time that he has been out of work, any return to work should be initially on a gradual basis with advancement to full-time work as tolerated. He is not so clinically depressed as to be unable to function at least in noncognitively demanding environments.

A question remains whether the claimant is unusually sensitive for whatever reason to racially insensitive or hostile comments by others, and may have misinterpreted others' behavior as racially hostile and discriminatory. He denied a history of such sensitivity or previous hostile work experiences, and stated that he has been called "nigger" many times in his non-work life without experiencing significant emotional distress. He admitted to me that he became more easily offended over time by racial remarks at PHB, and that he lost the ability to distinguish between humorous and malicious remarks or behavior in others. He described a sensitization process in which even innocuous comments became offensive to him. His personality configuration may predispose him to interpret others' behavior in this way. I do not have any historical data to indicate that the claimant was unusually sensitive to such remarks or behavior by others prior to the PHB employment, though the MMPI test results suggest this.

All of the above opinions are expressed to a reasonable degree of psychiatric certainty. The opinions expressed herein are based upon the available information and are subject to change upon the receipt of additional information. Thank you for the opportunity to consult with you in this matter. Please do not hesitate to contact me with any questions about this report.

Sincerely,

Robert M. Wettstein, M.D.
Board Certified in Psychiatry
and Forensic Psychiatry

RW:sc