IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAYVED WOODARD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 04-141 Erie |
| ) | |
| PHB DIE CASTING, ) | |
| ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J.

Presently pending before the Court is the Motion for Summary Judgment filed by the Defendant, PHB Die Casting.

### I. BACKGROUND

Plaintiff, Dayved Woodard ("Woodard" or "Plaintiff"), started working at PHB Die Casting ("PHB" or "Defendant"), on February 9, 1998. Plaintiff, an African-American male, worked primarily as a Die Cast Punch Operator at PHB's Fairview location. (Complaint ¶ 5). Plaintiff remained at PHB through October 17, 2003.

Plaintiff contends that, throughout his four years working at PHB, he was subjected to a racially hostile work environment. Plaintiff recounts the following comments and incidents which purportedly took place during his tenure at PHB in support of his allegation of a racially hostile environment.

Woodard cites two incidents where a co-worker reported to him that another co-worker had used the racially offensive term "nigger." (Complaint ¶¶ 19, 21; Woodard Depo., Dkt. #21, Ex. 3, pp. 33-40). Neither of these comments were made in the presence of Woodard or any other minority employee. (Woodard Depo., pp. 33-34). Woodard further testified that he had never actually overheard that word while working at PHB. (Id. at 39-40).

Woodard also describes an incident that occurred in 2000 where he and another African-American employee, Jamal Shields, were horsing around and laughing because Shields had hit Woodard with a rubber band. After observing their horseplay, Jay Lewis, a PHB employee,

1

purportedly queried another employee, Al Cropeck, as to "who let the monkeys out?" (Woodard Depo., pp. 42-44). Again, Woodard did not actually hear the comment firsthand, but had it relayed to him by Cropeck. (Id.)

Woodard testified that a fellow employee, Nick Hazenback, had twice used the phrase, "you people," in Woodard's presence. Sometime in 2000, Hazenback approached Woodard and asked him how many children he had. When Woodard told Hazenback that he had two daughters, Hazenback commented, "I thought you people had a lot of kids." (Complaint ¶ 30; Woodard Depo., pp. 47-48). Although Hazenback told Woodard that he "didn't mean anything by it," Hasenback apparently made the same "joke" about a year later after having forgotten the prior exchange. (Woodard Depo., p. 48). Hazenback also made a comment in 2001 to the effect that Woodard's stocking cap made him look like he was headed out to do a "drive-by shooting." (Id. at 81).

Another PHB employee, Gordon Phillips, used the phrase "you people" in a conversation with Plaintiff on Martin Luther King Day in 2000. According to Woodard, Phillips expressed surprise that Woodard had shown up for work that day, remarking that "I thought it was a holiday for you people." (Id. at 49-50).

Later in 2000, Woodard asked a co-employee, Dave Turner, for a bathroom break. Turner responded, "what do you need to do, go handle one of your drug deals?" (Complaint ¶ 32; Woodard Depo., p 54).

Woodard also recounts three incidents that took place between himself and a PHB electrician, Bill Diehl. Woodard testified that Diehl approached him in 1999 and asked, "what are you?" When Woodard asked what he meant, Diehl rejoined, "well, you're too light to be black, too dark to be white, what are you?" (Woodard Depo., pp. 55-56). Later on, in 2001, Diehl encountered Woodard while looking for an African-American female co-worker, Darlene Jones, and said, "I'm looking for someone. You're the right color, but the wrong sex." (Id. at 57). Finally, in early 2003, Woodard was approached again by Diehl, who queried whether Woodard knew where chitlins came from. When Woodard indicated no, Diehl informed him that chitlins were "what the slaves were allowed to have after the master made them slaughter the pigs." (Id. at 54-55).

In addition to the aforementioned comments, Woodard testified to once seeing a small graffiti of a "cross with a KKK" in one of the bathrooms at PHB. (Complaint ¶ 27; Woodard Depo., p. 69).

2

The image appeared to be drawn by means of a black ballpoint pen and was approximately 2 inches by 3 inches high. (Id.) Woodard testified that PHB removed the graffiti after Woodard complained about it, but that it took several months for them to do so. (Id. at 70-71).

In addition to his allegations of a hostile work environment, Woodard asserts that, throughout his employment at PHB, he was routinely assigned to "harder" jobs than white employees in his position. Without citing specifics, Woodard contends that he suffered disparate treatment in his job assignments, primarily by being assigned to "the worst jobs within the workplace" and "routine assignment to the most difficult machines." (Complaint ¶ 9). Woodard further contends that, while he was assigned to the "worst and most difficult jobs," Caucasian employees routinely were assigned to "easier" jobs. (Complaint ¶ 11).

Woodard filed the underlying complaint on May 26, 2004. PHB filed a motion for summary judgment on May 23, 2005, and Woodard responded on June 26, 2005. PHB filed a reply on August 22, 2005, and oral argument on the summary judgment motion was held on September 12, 2005. This matter is ripe for review.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In order to withstand a motion for summary judgment, the non-moving party must "make a showing sufficient to establish the existence of [each] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In evaluating whether the non-moving party has established each necessary element, the Court must grant all reasonable inferences from the evidence to the non-moving party. Knabe v. Boury Corp., 114 F.3d 407, 410, n.4 (3d Cir. 1997) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. (quoting Matsushita, 475 U.S. at 587).

## III. HOSTILE ENVIRONMENT

3

Under Title VII and the PHRA it is unlawful for an employer to discriminate against any individual with respect to this compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex or national origin. See Weston v. Commonwealth of Pennsylvania, Dept. of Corrections, 251 F.3d 420, 425 (3rd Cir. 2001), citing 42 U.S.C. § 2000e-2(a)(1).[1] To establish a claim under Title VII based on an intimidating or offensive work environment, a plaintiff must show: "(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability." See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3rd Cir.1996). In employing this analysis a court must evaluate the frequency of the conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). Title VII is not violated by "[m]ere utterance of an ... epithet which engenders offensive feelings in an employee" or by mere "discourtesy or rudeness," unless so severe or pervasive as to constitute an objective change in the conditions of employment. See Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998) (citations omitted). Thus, "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious)" are not actionable under Title VII. Id. at 788.

Because we find that Woodard has failed to present a triable issue of fact with respect to elements two and four of the prima facie case for a hostile environment claim, we shall confine our analysis accordingly.

    *A.    Whether the discrimination was pervasive, regular and severe*

We note at the outset that Title VII is not meant to be a "general civility code for the workplace." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998). To be actionable

---

[1] The Third Circuit has consistently applied the same legal standard in analyzing claims brought pursuant to Title VII and the PHRA. Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 317 n.3 (3rd Cir. 2000); Jones v. School District of Philadelphia, 198 F.3d 403, 409 (3rd Cir. 1999). Therefore, although we analyze Woodard's claim under Title VII only, our analysis is equally applicable to his PHRA claim.

under Title VII, the harassment must be "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive work environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (citations and internal quotation marks omitted). As the Supreme Court has made clear, conduct "must be extreme to amount to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788. Harassment is pervasive and regular when "incidents of harassment occur either in concert or with regularity." Andrews, 895 F.2d at 1484. Despite this high standard, however, the Third Circuit has acknowledged that "the advent of more sophisticated and subtle forms of discrimination requires that [courts] analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." Cardenas v. Massey, 269 F.3d 251 (3rd Cir. 2001).

In Cardenas v. Massey, 269 F.3d 251 (3rd Cir. 2001), the defendants subjected a Mexican-American plaintiff to ethnic slurs, including referring to him as "the boy from the barrio" and "*mojado*" (the Spanish word for "wetback"), dealt with disagreements by asking if the plaintiff intended to pull out a switchblade, wrote derogatory messages on the marker board in plaintiff's cubicle, rounded the numbers on all other employee evaluations upward while rounding the plaintiff's numbers downward, disproportionally assigned other minorities and trainees to the plaintiff's unit, gave him knowingly contradictory instructions and impossible-to-perform tasks, and referred to him as "an affirmative-action hire." Cardinas, 269 F.3d 259. The Third Circuit found those activities to be sufficiently severe and pervasive to constitute a hostile work environment. Id. at 263. Similarly, in Aman v. Cort Furniture Rental Corp., 85 F.3d 1074 (3rd Cir. 1996), the Court found a hostile work environment where African-American employees were referred to as "one of them" or "another one," told not to touch or steal anything, made to do menial jobs, screamed at, threatened with termination, had their time cards stolen, were falsely accused of wrongdoing, had information necessary to their jobs withheld, and were given conflicting orders. Additionally, the employer's general manager had stated at a district meeting that "the blacks were against the whites" and that if they did not like it they could leave. Aman, 85 F.3d at 1082-84.

When judged against the above, the conduct here is patently insufficient to satisfy the severity requirement of a hostile environment claim. While the comments and conduct at issue here were

5

unprofessional and insensitive, courts have consistently required a stronger showing of egregious conduct than that described by Woodard. See, e.g., Sherrod v. Philadelphia Gas Works, 57 Fed. Appx. 68, 75-77 (3rd Cir. 2003) (holding that alleged incidents, including managers making comments that "the way [two African-American employees] were eating at their desks, it must be their culture," and that if such clerks did not do their work, "I'm going to sit at their desks with a whip," were not sufficiently severe and pervasive, even considering the comments in conjunction with other facially neutral alleged mistreatment of the employee); Jackson v. Flint Ink N. Am. Corp., 382 F.3d 869, 870 (8th Cir. 2004) (denying summary judgment where plaintiff was subjected to six racially derogatory comments, including use of the word "nigger" in his presence, and particularly because plaintiff witnessed a physically threatening graffiti depicting his name in conjunction with a burning cross and a KKK sign, but noting that the decision to deny summary judgment "is not altogether free from doubt," and that the facts straddled the "cusp of submissibility."); Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 838, 844 (8th Cir. 2002) (holding that "racist graffiti - drawings of 'KKK,' a swastika, and a hooded figure" on the walls of the plant bathroom, a racially derogatory "poem" strewn about the plant, and three racially derogatory comments made about plaintiff (but out of his presence) were "neither severe nor pervasive. . ."); Peters v. Renaissance Hotel Operating Co., 307 F.3d 535 (7th Cir. 2002) (finding that six incidents, including a reference to black music as "wicka wicka woo music" by a supervisor, a bartender's request to investigate an African-American guest who was allegedly stealing coins from a fountain, other African-American guests being denied additional ice and cups for a party, and one use of the word "nigger" in plaintiffs presence, were not severe or pervasive); Bolden v. PRC, Inc., 43 F.3d 545, 551 (10th Cir. 1994) (holding that two overtly racial remarks directed at plaintiff, including use of the terms "nigger" and "KKK," distribution of an arguably racial cartoon, and general ridicule and harassment were not severe or pervasive).

Unlike in the cases discussed above, Woodard's counsel admitted that very few racially tinged comments were actually directed towards Plaintiff in his presence. Woodard testified that he never overheard a single use of the more offensive terms alleged, "nigger" and "monkey":

> Q:   Just to make sure I understand then, the use of the
>      word nigger at PHB was not something concerning
>      which you had personal knowledge, but rather - -

6

> A: I never heard it.
>
> Q: What you've told me is information provided by others?
>
> A: Right.

(Woodard Depo., pp. 39-40). Counsel reiterated this point at oral argument:

> The Court: He also testified that he himself never heard directly any racial slurs, is that correct?
>
> Mr. Johnson: He never directly heard the word nigger. He did - - he did hear different comments or phrases that he took as racial or slurred.
>
> The Court: So he never heard that term directed to him?
>
> Mr. Johnson: That's correct.

(Hearing Transcript, 9/12/05, p. 14).

Indeed, the only comments Woodard directly overheard were the comment about the drug deal, the comment about the drive-by shooting, the comment about chitlins, and the two references to "you people." Each of these remarks are tinged with racial overtones and stereotypes and are undoubtedly offensive, but none are egregiously severe. Woodard was not physically threatened or humiliated. See Harris, 510 U.S. at 23 (noting that circumstances to consider "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."). Rather, the comments he endured were precisely the type of "isolated incidents of racial enmity" that are not actionable under Title VII. See Snell v. Suffolk County, 782 F.2d 1094, 1103 (2nd Cir. 1986). Even coupled with the single instance of racist graffiti observed by Woodard, they do not rise to the level of severity displayed in Cardenas and Aman.

In addition to being qualitatively deficient, many of Woodard's claims, including those that are the most egregious, consist of hearsay statements that are unsupported by first-hand evidence. Although incidents occurring outside of a plaintiff's presence and not directed at him are relevant to a hostile environment claim under the requisite totality of the circumstances analysis, see Schwapp v. Town of Avon, 118 F.3d 106, 108-09 (2nd Cir. 1997) (citing Harris, 510 U.S. at 23), the Third Circuit has held that "comments referring to other individuals that [are] merely overheard by [plaintiff] are the sorts of 'offhanded comments and isolated incidents' that the Supreme Court . .

. cautioned should not be considered severe or pervasive enough to constitute a hostile work environment." Caver v. City of Trenton, 2005 WL 2045715 (3rd Cir. 2005) (quoting Faragher, 524 U.S. at 788).

In sum, we conclude that Woodard has failed to come forward with sufficient evidence to create a triable issue of fact as to whether his "workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment." Harris, 510 U.S. at 21. Consequently, summary judgment is appropriate on this basis.

>   B.   *Whether the discrimination would have detrimentally affected a reasonable person of the same race in that position*

We also find that Woodard has failed to raise a triable issue of fact with respect to the fourth prong set forth in Aman, namely, that the discrimination would have detrimentally affected a reasonable person of the same race in his position. Aman, 85 F.3d at 1081. In considering whether the objective test is met, we are directed to consider "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23; see also Abramson v. William Patterson College of New Jersey, 260 F.3d 265, 280 (3rd Cir. 2001).

As discussed above, the conduct at issue here was neither frequent nor severe. The incidents described by Woodard, even assuming that they were indeed racially motivated, are insufficient as a matter of law to establish that the work environment here would have been hostile from the "standpoint of a reasonable person." Consequently, summary judgment is appropriate on this alternative ground.

### IV. DISPARATE TREATMENT

Assertions of disparate treatment are governed by the burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Thus, Woodard bears the initial burden of establishing a prima facie case by a preponderance of the evidence. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993). To establish his prima facie case, Woodard must demonstrate that: (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action despite being qualified; and (4) the circumstances of the adverse

employment action create an inference of discrimination. See Sarullo v. United States Postal Serv., 352 F.3d 789, 797 (3rd Cir. 2003) (citing McDonnell Douglas, 411 U.S. at 802).

When a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the employer's allegedly adverse action. McDonnell Douglas, 411 U.S. at 802. If the defendant meets this burden, the plaintiff then must establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action. Id. at 804.

Woodard, an African-American, is a member of a protected class. Moreover, it is not disputed that Woodard was qualified for his position as a DCPO at PHB. Woodard's claim fails, however, because he had not raised a triable issue of fact as to whether he was subjected to an adverse employment action creating an inference of discrimination.

The Supreme Court has defined an adverse employment action as:

> A tangible employment action consists of a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. . .  A tangible employment action in most cases inflicts direct economic harm.

Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761-62 (1998). Such an action must be "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3rd Cir. 2004) (quoting Cardenas, 269 F.3d at 263).

Loss of money or benefits is not required in order for a change in an employee's working conditions to constitute an adverse action; rather, an adverse employment action might consist of changes in location, duties, perks, or other basic aspects of the job. Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 787 (3rd Cir.1998) (citing Collins v. Illinois, 830 F.2d 692, 703 (7th Cir.1987)). Thus, courts have consistently held that "discriminatory assignments, undermining of work conditions and harassment are exactly the kind of actions that Title VII was designed to prevent." See Ferrell v. Harvard Industries, Inc., 2001 WL 1301461, *20 (E.D. Pa. 2001); Mondzelewski, 162 F.3d at 787 (meat factory worker's reassignment to a shift leaving him less free time and requiring him to work Saturday evenings was sufficient to raise a triable issue as to whether

9

the terms, conditions and privileges of his job were altered in retaliation for discrimination complaint); Hampton v. Borough of Tinton Falls Police Dep't, 98 F.3d 107, 116 (3rd Cir.1996) (under Title VII, appointment to undesirable police assignment sufficient to withstand summary judgment on retaliation claim); Collins, 830 F.2d at 703 (under Title VII, "adverse action" does not require loss of money or benefits but rather may consist of changes in location, duties, perks, or other basic aspects of the job).

Here, Woodard asserts that he "has consistently been subjected to disparate treatment based upon his race in the form of assignment to the worst jobs within the workplace and . . . routine assignment to the most difficult machines . . .". (Complaint ¶ 9). Woodard further alleges that Caucasian employees were assigned to much easier jobs. (Complaint ¶ 11). In the abstract, this allegation of racial bias in the assignment of workplace tasks sufficiently implicates the "terms, conditions and privileges of his job" so as to be cognizable under Title VII. See, e.g., Mondzelewski, 162 F.3d at 787. Nonetheless, Woodard's claim fails because he has not produced sufficient evidence to raise a triable issue of fact as to whether he was assigned to "more difficult" jobs than white employees at PHB.[2]

In response to Woodard's allegations, PHB has presented a spreadsheet report identifying each job and machine operated by Woodard throughout his employment at PHB. PHB's report also identifies, by name and race, the other employees who ran the same job and machine during shifts before and after Woodard. (Affidavit of Catherine Bernard, Dkt. #25, Ex 2, Woodard Job Activity Report). The results of the report demonstrate that white employees at PHB were assigned to the same jobs and machines as Woodard during shifts preceding and following Woodard's shift. (Bernard Affidavit, ¶¶ 2-9). Moreover, PHB has provided affidavits asserting that job assignments at PHB were made on a random basis without regard to race, and that most incidents where an employee worked the same machine more frequently than other employees resulted from temporary production needs, customer priorities, or an employee's expertise and training on an individual machine. (Phillips Affidavit ¶¶ 16-17; Sayers Affidavit ¶¶ 13-18).

---

[2] We have serious doubts, in any event, that Woodard's conclusory allegations of being assigned to "more difficult" jobs, in and of itself, is sufficiently particularized to reasonably support a conclusion that he was subjected to an adverse employment action at all.

Woodard argues that PHB's spreadsheet fails to account for several factors that impact on the difficulty of a job assignment beyond simply the machine that is used. These include the size of the parts being placed in the machine, the composition of those parts, and the cycle time of the machine. (Woodard Depo. I, pp. 69-71). Be that as it may, Woodard offers no evidence that white employees who worked on the same machines had the luxury of machining parts that were lighter and less cumbersome over a longer period of time.

Moreover, even if Woodard could demonstrate that he was routinely assigned to more difficult jobs than his co-workers, his testimony indicates that any such disparity resulted from an incident between Woodard and his supervisor, rather than because of his race. Woodard testified that his assignment to more difficult jobs "started after an incident with Ron Sayers." (Woodard Depo., p. 82). According to Woodard, Rex Ryan, a PHB supervisor, had asked Woodard to come in for a Saturday shift. Due to an apparent mis-communication between Ryan and Sayers, Sayers, who was not expecting Woodard to come in that Saturday, ordered him to go home. (Id.) Although Woodard complied with Sayers' order to go home, PHB later investigated the incident and paid him for the time he spent at work that Saturday. (Id.) Woodard testified that this incident provoked Sayers to assign him to difficult jobs:

> [F]rom there on, you know, I just felt like, you know, Ron had it out for me. I'm not sure if he got in trouble for sending me home or what. But from there on I felt like he had it out for me. And he was putting me on, you know, the worst jobs he could here and there.

(Woodard Depo., pp. 82-83).

Moreover, Woodard testified that Sayers would "take care of" Jamal Shields, an African-American, by giving him easier jobs and assignments. (Woodard Depo., p. 97). Sayers allegedly urged Woodard to be more like Shields. (Id.) While this supports the inference that Sayers may indeed have "had it out for" Woodard, it does nothing to ascribe any racial animus to the discriminatory conduct.

In sum, Woodard has not raised a triable issue of fact as to whether he was assigned to difficult jobs more frequently than his white employees. As such, he cannot make out a prima facie case of disparate treatment and summary judgment is appropriate.

### VI. CONSTRUCTIVE DISCHARGE

To sustain a constructive discharge claim, a Plaintiff must prove that his employer knowingly

engaged in conduct which foreseeably resulted in working conditions so intolerable or unpleasant that a reasonable person in the employee's position would resign. See Durham Life Ins. Co. v. Evans, 165 F.3d 139, 155 (3rd Cir. 1999); Aman, 85 F.3d at 1085. Summary judgment is appropriate if a trier of fact could not reasonably conclude that a reasonable person in the plaintiff's shoes would have felt compelled to resign. Hopson v. Dollar Bank, 994 F.Supp. 332, 340 (W.D. Pa. 1997).

As noted above, Woodard's allegations fall short of demonstrating that a hostile working environment existed at PHB. Thus, Plaintiff cannot establsih the necessary factual predicate for a constructive discharge claim. See Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 718-719 (3rd Cir. 1997) ("In light of our conclusion that no hostile work environment existed . . ., [plaintiff] cannot show the necessary predicate to maintain a constructive discharge claim, specifically, that there were 'conditions of discrimination' so intolerable that a reasonable person would have resigned."); Greb v. Potter, 2005 WL 1387649, *10 (D.N.J. 2005) ("[T]he Third Circuit [has] intimated that if a plaintiff fails to demonstrate a hostile work environment claim, the plaintiff will likewise fail to establish the necessary predicate for a constructive discharge claim.").

## VI. PENNSYLVANIA HUMAN RELATIONS ACT

Claims of race discrimination under the Pennsylvania Human Relations Act, 43 Pa. C.S.A. § 951 et seq., are analyzed under the same framework as a Title VII claim, "as Pennsylvania courts have construed the protection of the two acts interchangeably." Weston v. Pennsylvania, 251 F.3d 420, 425 n. 3 (3rd Cir. 2001); see also Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317 (3rd Cir. 2000) (holding that Title VII and PHRA discrimination analyses are identical). Accordingly, for the reasons discussed *supra*, summary judgment is also granted as to Woodard's PHRA claim.

## VII. CONCLUSION

For the foregoing reasons, PHB's motion for summary judgment is granted. An appropriate Order follows.

Case 1:04-cv-00141-SJM     Document 37     Filed 11/18/2005     Page 13 of 14

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAYVED WOODARD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 04-141 Erie |
| ) | |
| PHB DIE CASTING, ) | |
| ) | |
| ) | |
| Defendant. ) | |

**ORDER**

AND NOW, this 18th day of November, 2005, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Motion for Summary Judgment filed by Defendant, PHB Die Casting, [Doc. No. 19] is GRANTED.

IT IS FURTHER ORDERED that Judgment is hereby entered in favor of Defendant, PHB Die Casting, and against Plaintiff, Dayved Woodard.

The clerk is hereby directed to mark the case closed.

/s/ Sean J. McLaughlin
Sean J. McLaughlin
United States District Judge

cm: All parties of record. ___